*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRENTON TYLER SPAULDING,

Defendant-Appellant.

FOR PUBLICATION
June 25, 2020
9:00 a.m.

No. 348500
Kalamazoo Circuit Court
LC No. 2017-001835-FH

Before: BORRELLO, P.J., and RONAYNE KRAUSE and RIORDAN, JJ.

RONAYNE KRAUSE, J.

A jury convicted defendant of aggravated stalking, MCL 750.411i. Defendant's conviction arose out of three communications he made in late 2017 to the victim, AA. Defendant and AA had been in a dating relationship from 2013 to 2015, and defendant owed a substantial debt to AA in part because AA had bailed defendant out of jail twice. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 3 to 10 years' in prison. Defendant now appeals his conviction as of right. We affirm.

## I. BACKGROUND

As noted above, defendant and the victim, AA, were in a dating relationship between 2013 and 2015. The victim explained that defendant lived at her residence during that time, although "he was in and out of jail a lot." After the relationship ended, she "avoided him as much as possible but he kept coming around and doing weird things and banging on [her] windows at night and just stalking me." Those "weird things" included leaving "strange objects in [her] yard, stuffed animals and such" and arranging things into "pyramids." AA also explained that defendant had previously "hurt" her. Relevant to this appeal, she described four previous incidents from 2013, 2015, and 2017, involving defendant.

In December 2013, defendant came over to AA's residence seeking to "get rid of the people on the couch." There were no people on the couch, nor was anyone else in the residence. Defendant also put Christmas ornaments in the sink, put on AA's pink bathrobe, took the shower curtain out, asked AA to help him build a bonfire, wielded a baseball bat with an angry "look in his eyes," and informed AA that "Jesus Christ told him to smack [her]." Defendant proceeded to

"smack" AA in her face with an open hand, whereupon AA called 911. One of the responding police officers described AA as visibly upset, and she described defendant as very erratic, speaking in nonsensical terms, and talking about how he was told what to do by Jesus. The responding officer who transported defendant to jail on that occasion testified that during the trip, defendant stated that the reason he had hit AA was because "she had hit him first and that sometimes you have to slap a ho." Defendant compared AA to Satan and stated that she was not able to control herself. AA explained that she stayed with defendant thereafter because defendant was very charismatic and apologetic, and he would tell AA constantly how much he cared about her. AA also explained that she got into the relationship with defendant shortly after her father had committed suicide, and defendant reminded her of her father in some ways.

The next incident to which AA testified occurred in March of 2015, when she brought food to defendant at a house where defendant was working as a contractor. She explained that they both drank some alcohol and initially were having a good time. AA denied drinking enough to become intoxicated, but defendant drank considerably more, to the point AA believed he was intoxicated. Defendant started to become angry, apparently at first because the person for whom he was working opined that defendant was doing the work improperly. At some point, AA told defendant that she "was concerned about his drinking and that it's gonna kill him eventually," whereupon defendant "just drank more." Defendant also accused AA of taking his wallet and dumped out the contents of her backpack. When AA tried to leave, defendant grabbed her by her hair and dragged her halfway down the stairs into the basement while she struggled to escape. Defendant's leg got caught in the process, whereupon AA "tumbled to the bottom and hit [her] face on the cement." AA testified that a portion of her hair got ripped out, her scalp and hands were bleeding, and she had scrapes and bruises everywhere from the incident. She testified that by the time of trial, she "still ha[d] a big bump" on her forehead where she struck the concrete.

AA stated that when she got up from the fall, she grabbed her backpack, left the house, and called the police. AA explained that she stayed in the relationship with defendant afterwards because defendant was very emotional and told her how madly in love with her he was and how he was going to start taking his meds and that he would quit drinking. Defendant also told AA that he was getting a check on the third of the month and that he would pay her the money he owed her then.

In May 2015, defendant showed up at AA's residence screaming through the door. AA stated that she shouted back through the closed, locked door that she wanted defendant to leave. Defendant tried to enter through the back door but was unable to do so. Defendant then went to the front door, broke the glass, and entered AA's home. AA stated that she was shaking and scared. Defendant then picked up a shard of glass, held it to AA's neck, and told her, "I'm going to kill you now." Defendant did not carry out this threat, nor did he actually cut AA, but AA was nevertheless frightened. Defendant eventually let AA go, whereupon she called the police. Defendant stayed in AA's home until the police arrived. Responding officers described AA as frantic, scared, and very timid. A neighbor testified that AA was very shaken, very stressed out, and seemed scared. AA remained with defendant after this incident because defendant was remorseful, told her that he loved her, and wanted to get married. Defendant also said that he would pay her back the money that he owed her.

The final prior incident to which AA testified occurred on May 22, 2017. AA stated that defendant began banging on her door, she shouted to him to leave her alone, or she would call the police, and minutes later defendant was in the bushes in her front yard next to her living room window. AA stated that defendant had a big wooden staff with a dead cat on it, and he went around her house banging on all of her windows. AA stated that defendant made her feel afraid, and she called the police. A responding officer testified that AA was very distraught, shaking, and very nervous. As a consequence of the May 22, 2017, incident, defendant was arrested, charged with, and convicted of stalking.

As noted, during the course of their relationship, defendant accrued considerable debt to AA. AA explained that she "got him out of jail twice for drunk drivings [sic] which were $5,000 each, as well as giving him [her] credit card and he ran it up all the way." Defendant promised to pay her back for the bail bonds and credit card debt. On May 31, 2017, while defendant was incarcerated for the May 22, 2017, incident, AA wrote a letter to defendant at the jail requesting payment of a portion of that debt. The letter has not been provided to us, but AA read it out loud to the jury as follows:

> I just got done donating plasma to pay your credit card bill. My arm hurts, I'm weak. I—if you could pay $6,000 for the two times I got you out of jail, I will not pursue you with court hearings, otherwise you'll be going to jail for stalking and trespassing. Why would you put a dead cat skull on my window and bang it around? I broke up with Myron or he would have beat you up. You need help. I will continue to pray for you. I really wanted to get married and live on a lake, a pontoon and a Doberman dog. You didn't just fuck up your life, you fucked up mine four [sic] years. A bad man you are. I wish you were a better man like I deserve. [AA].

AA admitted that she did not say so explicitly, but she explained that she expected defendant to either send her the money or have someone else deliver it to her.

The first of defendant's actions upon which his current conviction is based occurred on October 26, 2017, when AA received a letter from defendant while defendant was in jail. AA explained that she did not open the letter, because it brought back all the negative times that she and defendant had shared together, and receiving the letter made her feel afraid. Instead, AA contacted the police. AA turned the unopened letter over to the police, who verified that it had been sent by defendant from jail.

Next, AA received a voice mail from defendant on November 12, 2017. In the voice mail, defendant stated that he was madly in love with AA and that he wanted to pay her back the money that he owed her. Defendant wanted AA to meet him at the Circle K.[1] He told her that she could call him back if she wished to and that if she did not wish to have defendant contact her anymore, he would not. Further, defendant stated that he had no ill feelings toward AA, that he was not stalking her, and that he loved her. AA testified that the voice mail made her feel frightened because she thought that defendant was going to come and hurt her again. On the basis of this

---

[1] The Circle K is a store that was located down the street from AA's residence.

fear, AA contacted the police. The responding officer described AA as nervous, anxious, distraught, upset, and concerned—not smiling, happy, or giddy. The officer confirmed that defendant identified himself as the caller in the voice mail.

AA then sought a personal protection order (PPO) because she felt afraid. The parties stipulated that the PPO was signed by the judge on November 13, 2017, but it was not served on defendant until December 7, 2017. On December 6, 2017, defendant sent AA a text message, asking her to meet her at the Circle K so he could give her the money that he owed to pay her credit card. AA said that when she received defendant's text message, she was frightened because he was contacting her in violation of the PPO she had in place against him, and it was his way of hurting her again; he had hurt her many times in the past. When AA received defendant's text message, she immediately called the police. The responding officer described AA as "a little timid . . . almost afraid." The officer also noted that AA "had stated multiple times while [the officer] was there that [defendant] had been coming around her house and contacting her and she didn't want, she was even afraid to report the other instances to th [sic] police." As noted, AA explained that at that point, defendant had recently gotten out of jail and done "weird things" in her yard. She observed defendant seemingly attempting to make a cross (which fell over) out of bricks and stones, and "then he put stuffed animals around it."

Although AA believed defendant was in violation of the PPO, defendant would not be served until the next day. AA conceded that defendant did not explicitly state any physical threats or otherwise indicate that he was going to harm her or come to her house. Rather, AA stated that the voice mail and text message she received from defendant were along the lines of, "I love you, I miss you, and I want to pay you money back." However, AA noted that after each of the previous incidents during their relationship, defendant would also say he was sorry, describe how he felt positively about her, and discuss repaying her and stopping drinking.

Connie Black-Pond, a licensed social worker and a licensed professional counselor with extensive training in victimology and trauma, was qualified without objection "as an expert in domestic violence and its effect on the victims of domestic violence." Black-Pond explained that domestic violence was generally about needing control and power over another person and possibly also their family, environment, and resources. She further explained that the violence and controlling behavior itself tended to be progressive and would escalate—generally starting with irritability and resulting in physical violence or other severe conduct. Offenders generally followed up with a "honeymoon stage" by expressing a great deal of regret and love, and making promises of improvement or seeking help, again for the purpose of keeping the victim from leaving. Ultimately, the offender would return to more direct violence and control. Black-Pond noted that these cycles might occur at varying rates from hours to months, and they might even be "blurry" or overlap. Offenders would generally become even more dangerous and aggressive whenever it appeared that their method of control was no longer working, such as a victim obtaining a protective order or making clear steps to leave. Offenders generally also posed a danger to anyone else related to their victim, such as the victim's children, and to anyone who might try to intercede or help the victim.

Black-Pond explained that it was "extremely common" for people in relationships involving domestic violence to remain with the abuser for "multiple reasons." For example, many victims remained in such relationships because they believed it would harm their children more to

leave than to stay. Victims might not know what to do or where to go, because by then their relationships with anyone other than the abuser has been degraded and they might not be capable of financial independence; furthermore, they generally had some awareness that efforts to leave could result in them being killed or seriously harmed more than they would be otherwise. Victims might also believe they could control the relationship to some degree, and the "honeymoon phases" tended to be extremely enjoyable and hope-inducing. Abusers generally are very skilled at knowing, and preying upon, their victims' particular emotional needs and vulnerabilities. Finally, victims might have their self-esteem destroyed to the point of believing they deserved the abuse.

Black-Pond finally explained that what defense counsel called "battered woman's syndrome" was "aligned" with post-traumatic stress disorder.[2] She also explained that one survival mechanism for abuse, so that a victim could do things like take care of their children without being overwhelmed and terrified, was to distort their beliefs to "minimize" how bad the situation is. There was no real difference between adult and child victims of abuse: they "often find themselves in a hypervigilant state where they are always expecting something to happen and that is a natural response to chronic violence." She observed that this was an adaptive defense mechanism in order to keep a dangerous situation seemingly manageable. Although abusers are "often very aware of the weaknesses or vulnerabilities or the needs of the victim" and would manipulatively target those needs, victims might or might not have any awareness or understanding of the manipulation.

## II. ADMISSION OF OTHER-ACTS EVIDENCE

Defendant first argues that the trial court abused its discretion by allowing the admission of AA's testimony regarding the four prior incidents, because this other-acts evidence was more prejudicial than probative pursuant to MRE 404(b). We disagree.

### A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

We review de novo as a question of law whether evidence is admissible under a rule or statute, but we review for an abuse of discretion the trial court's ultimate decision whether to admit the evidence. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). An evidentiary error

---

[2] This has also been referred to as "battered spouse syndrome." See *People v Wilson*, 194 Mich App 599, 600-604; 487 NW2d 822 (1992). However, the better term would actually be "battered *partner* syndrome." See *State v Cook*, 164 Wash App 845, 847, 852-853; 129 P 3d 834 (2006), overruled in part on other grounds by *State v Magers*, 164 Wash 2d 174, 185-186; 189 P 3d 126 (2008) (holding that prior acts of domestic violence are admissible to enable the jury to assess both a victim's state of mind and general credibility). Although out-of-state cases are not binding, they may be persuasive. See, e.g., *People v Christel*, 449 Mich 578, 588 n 15; 537 NW2d 194 (1995) (relying on Oklahoma precedent to hold that, consistent with Black-Pond's testimony, "battered woman syndrome is a subcategory of posttraumatic stress disorder"). Because abusive conduct and victimization are neither gender-specific nor exclusive to married couples, the broader term "battered partner syndrome" used by the Court of Appeals of Washington is the most appropriate.

is only grounds for reversal if the record reveals that the error was more likely than not outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

"MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts." *Denson*, 500 Mich at 397. Thus, MRE 404(b) is a rule of inclusion, meaning it permits the admission of any logically relevant evidence, "*even if* it also reflects on a defendant's character," so long as the evidence is not "relevant *solely* to the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (emphases in original). However, "upon request, the trial court may provide a limiting instruction to the jury under MRE 105 to specify that the jury may consider the evidence only for proper, noncharacter purposes." *Id*. at 616.

Any such evidence is also subject to exclusion under MRE 403 if the probative value of that evidence is "substantially outweighed by the danger of unfair prejudice. *Mardlin*, 487 Mich at 616; MRE 403. Evidence is relevant if it affects the likelihood that any fact of consequence is true. MRE 401. "It is well established in Michigan that all elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998). Any relevant evidence will intrinsically be prejudicial to some extent; "unfair" prejudice exists where extraneous circumstances like shock, jury bias, sympathy, or anger pose a risk that the jury will give the evidence weight disproportionate to its rational probative value. See *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005).

Other-acts evidence may also be admissible without regard to MRE 404(b) if the other acts are so intertwined with the charged offense that they directly prove the charged offense, or their presentation is necessary to comprehend the context of the charged offense. *People v Sholl*, 453 Mich 730, 741-742; 556 NW2d 851 (1996); *People v Jackson*, 498 Mich 246, 263-265; 869 NW2d 253 (2015). Such evidence is also admissible to fill what would otherwise be "a chronological and conceptual void regarding the events" to the finder of fact. *People v Starr*, 457 Mich 490, 500-502; 577 NW2d 673 (1998) (quotation omitted).

B. ANALYSIS

The other-acts evidence in this matter, consisting of AA's description of the four incidents in 2013, 2015, and 2017, was properly admitted. Defendant was charged with aggravated stalking, which required the prosecution to establish that AA felt "terrorized, frightened, intimidated, threatened, harassed, or molested" and that defendant's conduct "would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested." M Crim JI 17.25. The evidence was that defendant's three communications did not *explicitly* convey any threats. It was impossible to comprehend the *significance of* those communications without an understanding of the history of the relationship between AA and defendant. Without knowing that history, the communications would have been innocuous. The prior incidents were critical to understand why a reasonable person would have felt (and AA did feel) scared by defendant's conduct under the

circumstances.[3] Furthermore, it is clear that defendant's prior acts of domestic violence were direct evidence of his aggravated stalking: it was literally his own prior misconduct that *made* the communications at issue crimes.

The evidence of defendant's prior conduct does speak about his character. However, because it was introduced for a proper purpose and was relevant, the fact that it could *also* give rise to inferences about defendant's character does not require its exclusion. The evidence had probative value, and we find no indication that the jury would have found it sufficiently shocking to decide the case on the basis of improper considerations. Therefore, we cannot find any danger that the evidence unfairly prejudiced defendant, much less that its probative value would be *substantially* outweighed by any such danger. MRE 403.

Accordingly, the trial court did not abuse its discretion when it admitted the other-acts evidence concerning the events that occurred in 2013, 2015, and 2017. This evidence was admitted for its relevance in proving defendant's connection to aggravated stalking; it did not rely on an improper "character-to-conduct inference." *Jackson*, 498 Mich at 275-276.

## III. INSTRUCTIONAL ERROR

Defendant argues that the trial court erred in failing to instruct the jury on the limited use of other-acts evidence, thereby depriving defendant of a fair trial. We disagree.

### A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

Generally, "[t]his Court reviews de novo claims of instructional error." *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008). However, unpreserved claims of instructional error are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule three requirements must be met: (1) error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights." *Id*. at 763. Reversal is warranted only if the plain error resulted in the conviction of an innocent defendant or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, citation, and alteration omitted).

---

[3] The "reasonable person" or objective "reasonableness" standard generally calls for consideration of the circumstances or situation. See, e.g., *People v Wright*, 89 Mich 70, 86; 50 NW 792 (1891); *Moning v Alfono*, 400 Mich 425, 435-436; 254 NW2d 759 (1977); *People v Hanna*, 459 Mich 1005; 595 NW2d 827 (1999); *People v Riddle*, 467 Mich 116, 129-130; 649 NW2d 30 (2002). The terms "reasonable individual" and "reasonable person" are essentially synonymous and have been treated by this Court as interchangeable. See *People v Mesik (On Recon)*, 285 Mich App 535, 547; 775 NW2d 857 (2009); *Assoc of Businesses Advocating Tariff Equity v Pub Service Comm*, 208 Mich App 248; 265; 527 NW2d 533 (1994). As we discuss, in cases like this, the history of interactions between an abuser and victim is so intertwined with the charged offense that the history must constitute part of the "circumstances." Thus, the "reasonable individual" in the jury instruction is a reference to the familiar and venerable standard of a reasonable person similarly situated to the victim.

A party's explicit and express approval of jury instructions as given waives any error and precludes appellate review. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011).

A defendant has the right to "a properly instructed jury." *People v Mills*, 450 Mich 61, 80; 537 NW2d 909 (1995). "[T]he trial court is required to instruct the jury with the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *Id*. Jury instructions are reviewed "in their entirety to determine if there is error requiring reversal." *People v McFall*, 224 Mich App 403, 412; 569 NW2d 828 (1997). "Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories if the evidence supports them." *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000). Thus, "[e]ven if somewhat imperfect, instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights." *Id*.

B. ANALYSIS

In this case, at trial, in pertinent part, the trial court instructed the jury as follows:

The prosecution has introduced evidence of claimed acts of domestic violence by the defendant for which he is not on trial. There is also evidence in Exhibits 1, 2 and 3 that the defendant has been convicted of crimes in the past for which he is not on trial. Before you may consider such alleged acts or convictions as evidence against the defendant, you must first find that the defendant actually committed such acts. If you find that the defendant did commit those acts, you may consider them in deciding if the defendant committed aggravated stalking for which he is now on trial.

You must not convict the defendant here solely because you think he is guilty of other bad conduct or convictions. The evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime or you must find him not guilty.

Defense counsel did express approval of these instructions and, indeed, helped create them. Nevertheless, we will consider this issue because, as we discuss below, defendant raises a challenge to counsel's efficacy partly on this basis, and in any event, we would find no error warranting reversal even if this issue had been fully preserved.

The instructions cautioned the jurors that defendant was not on trial for the prior acts of domestic violence, and they must find that defendant actually committed those acts before they could consider those acts. Additionally, the trial court reiterated that the jury may not convict defendant solely on the basis of "other bad conduct or convictions," and the evidence must convince the jury "beyond a reasonable doubt that the defendant committed the alleged crime or you must find him not guilty." These instructions may have been somewhat imperfect, deviating slightly from the standard language of M Crim JI 4.11a (other acts of domestic violence), by including language from M Crim JI 3.4 (impeachment by prior conviction), stating that "[t]here is also evidence in Exhibits 1, 2 and 3 that the defendant has been convicted of crimes in the past for which he is not on trial." Defendant argues that the instructions should have included at least some portions of M Crim JI 4.11 (limiting consideration of evidence of other offenses) by stating that

-8-

the jury may not use the other acts to conclude that defendant was a bad person or had a propensity to commit crimes. However, as discussed above, evidence of defendant's other acts was critical, *direct* evidence of defendant's commission of aggravated stalking.

Therefore, the instructions as given "fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Canales*, 243 Mich App at 574. Accordingly, despite the slight deviation from the standard jury instructions, we would find no clear error in the trial court's instructions even if this issue had been fully and properly preserved.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel provided ineffective assistance by: failing to determine that defendant knowingly exercised his right to remain silent; failing to request a *Daubert*[4] hearing to contest the admissibility of Black-Pond's testimony; and failing to seek a jury instruction on the jury's limited use of other-acts evidence. We disagree.

### A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Constitutional questions of law are reviewed de novo, while findings of fact are reviewed for clear error. *Id*. This Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent on the record. *People v Hieu Van Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019). Counsel is presumed to have been effective, and a defendant has the burden of establishing that counsel was not effective. *People v Anderson*, 322 Mich App 622, 628; 912 NW2d 607 (2018). Thus, defendant must show that counsel's performance was objectively unreasonable and that counsel's deficient performance is reasonably likely to have affected the outcome of the proceedings. *Id*.; citing *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

### B. RIGHT TO NOT TESTIFY

Defendant argues that defense counsel never informed him of the aspects of testifying or exercising his right to remain silent, and he would have gladly testified to his innocence had he been given the opportunity. Defendant contends that because there is no indication on the record that he either knowingly exercised his right to remain silent or had discussed it with trial counsel, this bolsters this claim.

A criminal defendant has a constitutional right to testify in his own defense. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). "Although counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *Id*. If a defendant "expresses a wish to testify at trial, the trial court must grant the request, even

---

[4] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

over counsel's objection." *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985).[5] However, if a defendant "decides not to testify or acquiesces in his attorney's decision that he not testify, the right will be deemed waived." *Id*. (quotation omitted). Furthermore, "there is no requirement in Michigan that there be an on-the-record waiver of a defendant's right to testify." *People v Harris*, 190 Mich App 652, 661-662; 476 NW2d 767 (1991).

The record contains no evidence that trial counsel advised or instructed defendant not to testify, precluded defendant from testifying, or verified whether defendant wished to testify. Defendant has not provided us with any kind of offer of proof as to what his testimony might have been. However, he does argue that he would at least have been able to tell "his side of the story," which has significant intrinsic value to anyone. Nevertheless, the deprivation of a criminal defendant's right to testify is not structural, so it is subject to harmless-error analysis. *People v Solomon*, 220 Mich App 527, 535-538; 560 NW2d 651 (1996). Defendant provides no basis for even suspecting that the outcome *might* have been different if he had testified. Furthermore, the right *not* to testify is self-executing; in contrast, the right *to* testify must be affirmatively claimed. *Simmons*, 140 Mich App at 684-685. Simply failing to express a wish to testify, if there was an opportunity to do, so is sufficient to "acquiesce" in trial counsel's decision not to call a defendant to the stand. *Id*. Defendant made no interjection when counsel rested, nor did he mention any desire to testify during his allocution at sentencing.

Clearly, even if not required, the wiser practice might have been for counsel to make a record of asking defendant whether he wished to testify. Nevertheless, this record suggests that defendant acquiesced in not testifying, and in any event, there is simply nothing to suggest that the outcome might have differed if he had testified. We cannot find that defendant received ineffective assistance of counsel on this basis.

## C. FAILURE TO REQUEST A *DAUBERT* HEARING

Defendant contends that defense counsel was ineffective for failing to request a *Daubert* hearing rather than consenting to the admissibility of the prosecution's expert witness, Black-Pond. We disagree.

Generally, expert testimony is not admissible unless the trial court first determines that the expert's theories, methodology, and underlying data are reliable under MRE 702, which in turn incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779-781; 685 NW2d 391 (2004). The trial court is not tasked with determining whether the proposed expert evidence is true or universally accepted. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007). The evidence must also have some rational benefit to the trier of fact's ability to resolve a fact at issue in the matter. *Daubert*, 509 US at 591-592. A "*Daubert* hearing" is simply an evidentiary hearing

---

[5] Although published opinions of this Court decided before November 1, 1990, are not strictly binding, MCR 7.215(J)(1), they are nevertheless precedential, MCR 7.215(C)(2), and they are thus afforded significantly more deference than would be given to unpublished cases. *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019).

under MRE 702 and MCL 600.2955 specifically to make the threshold determination "that the trier of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science." *Chapin*, 274 Mich App at 139.

The gravamen of defendant's argument appears to be that Black-Pond's testimony and expertise regarding domestic violence and how victims and abusers tended to act and react was irrelevant to defendant's charge of *stalking*, but the jury would have nevertheless regarded her testimony as devastating to the defense. As discussed above, defendant's stalking was inextricably intertwined with his history of abusive behavior toward AA. *Sholl*, 453 Mich at 741-742; *Jackson*, 498 Mich at 263-265. Furthermore, defendant raises no serious challenge to Black-Pond's qualifications and expertise, nor do we think he could, and it is well-established that battered partner syndrome "is from a recognized discipline." *People v Christel*, 449 Mich 578, 592; 537 NW2d 194 (1995), citing with approval *People v Wilson*, 194 Mich App 599, 603; 487 NW2d 822 (1992).[6] It has also long been recognized that the behavior of victims of varying kinds of trauma often appears irrational and confusing to most people; and expert testimony is admissible and appropriate to explain that behavior with no need to engage in an analysis of scientific reliability. *People v Beckley*, 434 Mich 691, 715-716; 456 NW2d 391 (1990) (BRICKLEY, J.); *Christel*, 449 Mich at 590-591; *People v Peterson*, 450 Mich 349, 369; 537 NW2d 857 (1995).

Consequently, counsel would have had no grounds for requesting a *Daubert* hearing into the scientific reliability of Black-Pond's testimony. Furthermore, Black-Pond's testimony was relevant and necessary because an understanding of the psychological and practical dynamics between abusers and victims cannot be presumed to be common knowledge. As a consequence, jurors might naturally question why a victim might remain with an abuser. In turn, they might then also question the victim's credibility or draw inaccurate conclusions about the victim's motives or intentions. Credibility of a witness is almost always at issue, and thus evidence bearing on that credibility is always relevant. *People v Lyons*, 51 Mich 215, 216-217; 16 NW 380 (1883); *In re Dearmon*, 303 Mich App 684, 696-697; 847 NW2d 514 (2014). Black-Pond's expert testimony was necessary to explain why AA's counterintuitive behavior both during and after her relationship with defendant was in fact normal and expected for a victim of abuse.[7] Any request for a *Daubert* hearing would have been meritless and therefore cannot be a basis for finding counsel ineffective. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

Additionally, defense counsel's failure to object may have been based on trial strategy. During cross-examination, defense counsel brought up the topic of battered partner syndrome and elicited Black-Pond's agreement that abuse victims "often find themselves in a hypervigilant state where they are always expecting something to happen." During closing argument, defense counsel

---

[6] See also, footnote 2.

[7] We note that Black-Pond did *not* render any opinion, implicitly or explicitly, whether AA actually had been abused or defendant actually committed any abuse, nor did she in any way vouch for AA's credibility. Her testimony was properly limited to discussing certain relevant aspects of victim-abuser dynamics in general. Furthermore, reference to "syndrome" evidence was brought up by defense counsel. See *People v Thorpe*, 504 Mich 230, 254-259; 934 NW2d 693 (2019).

-11-

directly conceded that AA clearly had suffered emotional distress, but pointed out that the jury instruction that would be given, M Crim JI 17.25(3) and (5), explicitly required "that the contact would cause a *reasonable individual* to" suffer emotional distress or feel afraid. Counsel observed that defendant was not a likable person and had done many inappropriate and "despicable" things, but that the case was simply about a letter, a voice mail, and a text message that would not be particularly troubling to a reasonable person. This is neither an unsound trial strategy nor an unreasonably calculated risk, even though it did not succeed. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 219 (2001); *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994).[8]

We therefore conclude that trial counsel did not render ineffective assistance by acquiescing in Black-Pool's expertise and in the admission of her expert testimony.

### D.  FAILURE TO SEEK LIMITING JURY INSTRUCTION

Defendant finally argues that the jury instruction given regarding defendant's prior convictions and the other-acts evidence was sufficiently erroneous so as to deprive defendant of a fair trial. We disagree. As we have discussed above, we find no error in the instructions as given. Therefore, defendant cannot show that the outcome of the proceedings would have been different if counsel had requested a "better" jury instruction. Consequently, defendant establish prejudice, so we cannot find counsel ineffective on this basis. See *Anderson*, 322 Mich App at 628.

### V.  CONCLUSION

We recognize that the instructions given to the jury could conceivably have been better, and trial counsel might have been wiser to confirm on the record whether defendant wished to testify. However, the instructions fairly presented the law and issues to the jury, and defendant cannot establish any prejudice from his failure to testify. In all other respects, the trial court committed no errors, and trial counsel rendered effective assistance in a very difficult case.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Stephen L. Borrello
/s/ Michael J. Riordan

---

[8] For the reasons discussed in footnote 3, however, this argument is somewhat less legally sound than it was tactically sound.